IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 19, 2018 Session

**TYLER JAMES REED v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sumner County
No. 2015-CR-353, 2010-CR-174      Dee David Gay, Judge**

**_____**

**No. M2017-00480-CCA-R3-PC**

**_____**

Tyler James Reed, the Petitioner, was convicted of first degree felony murder in the perpetration of a burglary, aggravated burglary, and employment of a firearm with intent to go armed during the commission of a dangerous felony. After this court affirmed his convictions on direct appeal and the Tennessee Supreme Court denied further review, the Petitioner filed a petition for post-conviction relief. The post-conviction court denied relief. On appeal, the Petitioner argues that he received ineffective assistance of counsel from lead trial counsel and appellate counsel. He asserts that lead trial counsel convinced him to offer a false proffer to the State, which foreclosed him from testifying at trial, and failed to investigate his mental health and voluntary intoxication at the time of the offenses. He additionally asserts that appellate counsel failed to file a petition to rehear after this court did not specifically discuss several issues raised in his direct appeal. After a thorough review of the facts and applicable case law, we affirm the judgment of the post-conviction court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Michael Pellegrin, Gallatin, Tennessee, for the appellant, Tyler James Reed.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Ray Whitley, District Attorney General; and C. Ronald Blanton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

This court summarized the facts underlying the Petitioner's convictions in the Petitioner's direct appeal opinion as the following:

This case involves the October 30, 2009 shooting death of Dickey Lassiter at his home in Sumner County, Tennessee. [The Petitioner] was arrested for the murder of the victim after being found in possession of a twelve-gauge shotgun while in a vehicle parked in the victim's driveway. The Sumner County grand jury indicted [the Petitioner] for murder in the perpetration of a burglary, aggravated burglary, and employment of a firearm with intent to go armed during the commission of a dangerous felony.

. . . .

Mary Lou Lassiter, the victim's sister, testified that the victim was sixty-one years old when he died. He had lived at his farm, Elephant Walk, since 1988. She said that his house was approximately 3,500 square feet in size, and the driveway to the house was three-quarters to one mile long. She further said that a rock wall encircled the house.

Ms. Lassiter testified that James Isenberg had been married to Olivia Lassiter, the sister of Ms. Lassiter and the victim, for a time. However, Mr. Isenberg was also friends with the victim and had lived with the victim for three years prior to the victim's death. Mr. Isenberg had passed away prior to the trial.

On cross-examination, Ms. Lassiter testified that she never heard the victim mention [the Petitioner]'s name. She agreed that the victim had been friends with Mark Griffin and that Mr. Griffin's son, Matthew,[1] had visited Elephant Walk.

James Isenberg, via deposition, testified that he had lived at the victim's house for approximately three years prior to the victim's death. On the night of October 29, 2009, Mr. Isenberg said that he and the victim

---

[1] For purposes of consistency and clarity, we will refer to Matthew Griffin by his full name throughout this opinion.

watched a football game. Mr. Isenberg then he went to the upstairs den where he fell asleep on the couch while watching television. He was awakened by [gunshots]. Mr. Isenberg testified that he heard two shotgun blasts, followed by the victim saying, "'You son of a b* * * *.'" He heard three pistol shots after the victim's exclamation. Mr. Isenberg went halfway down the stairs to investigate. He saw the victim lying on the floor and heard the victim moaning. While he watched, the victim stopped moaning. Mr. Isenberg assumed that he died at that point. Mr. Isenberg called 9-1-1.

Mr. Isenberg testified that the victim had six to seven rifles and shotguns in a gun rack in the downstairs den. The victim also had a pistol that Mr. Isenberg assumed was kept in the victim's bedroom. Mr. Isenberg testified that none of the victim's guns were missing after his death. He further testified that the victim owned several dogs, one of which he occasionally brought inside. Mr. Isenberg did not recall seeing or hearing a dog the night of the victim's death. He said that he had never seen [the Petitioner] prior to seeing him during the deposition.

. . . .

Sergeant Aaron Pickard testified that he was dispatched to the victim's residence at 4:26 a.m. He arrived at 4:35 a.m. and was the first officer at the scene. Sergeant Pickard saw a blue Cadillac in the driveway but did not see anyone inside. He ordered other responding officers to investigate the Cadillac when they arrived. When Sergeant Pickard approached the house, he saw Mr. Isenberg, through a glass storm door, standing on the staircase. Upon entering the house, he smelled gun powder. He found three shotgun shells on the floor, two of which were spent, and he saw a nine millimeter pistol beside the victim's body.

Deputy Christopher Magee testified that when he arrived at the victim's residence, he stopped at the Cadillac and directed all of the lights on his vehicle toward it. He saw movement inside and approached with his weapon drawn. He observed that [the Petitioner] was lying in between the front seat and floorboard, clutching a "dark colored long gun." Deputy Magee directed [the Petitioner] to drop the weapon and exit the vehicle. When [the Petitioner] complied, Deputy Magee handcuffed him and searched him. He asked him whether anyone was with him, and [the Petitioner] responded, "'No.'" He collected [the Petitioner]'s wallet and cellular telephone from [the Petitioner]'s pockets and placed [the Petitioner]

in the back of his patrol car. Deputy Magee testified that [the Petitioner] asked him several times whether he could call his parents and told him, "I didn't mean to shoot that guy[,] but I didn't want to get shot."

While [the Petitioner] was sitting in Deputy Magee's vehicle, officers were examining the crime scene and collecting evidence. Captain Don Badacour testified that from the house, he collected three shotgun shells, two of which were spent; three bullet casings, two of which were found in a room behind the victim's body and one of which was underneath his body; and the nine millimeter pistol. He further testified that there were three bullet holes in the house: one went through a front window after ricocheting off a door; one entered the wall by the front windows; and one entered the baseboard under the front windows. Captain Badacour also collected a twelve-gauge shotgun and packaging for a pair of gloves from inside the Cadillac, as well as a gun case from the Cadillac's trunk. On cross-examination, Captain Badacour testified that he dusted for fingerprints in the vehicle and in the house, but he was not aware of the results of the fingerprint analysis.

Lieutenant Christopher Tarlecky testified that he arrived at the crime scene at 5:15 a.m. He interviewed Mr. Isenberg and videotaped the crime scene. He spoke with [the Petitioner], but [the Petitioner] invoked his right to remain silent. Lieutenant Tarlecky performed a gunshot residue test on [the Petitioner]'s hands at the scene.

Lieutenant Tarlecky . . . later interview[ed] [the Petitioner] at the Criminal Investigation Division's office, but before that interview, Sergeant Pickard transported [the Petitioner] to the jail and then to the hospital to have his blood drawn for a toxicology analysis. Sergeant Pickard testified that when he and [the Petitioner] were leaving the victim's farm, they saw news vans parked at the end of the driveway. [The Petitioner] asked him "if his name was going to be on the news." Sergeant Pickard responded that "no one knew him by his name or what had went [sic] on at [that] point." Sergeant Pickard testified that [the Petitioner] then said "'I didn't want to kill that guy.'" The recording of their interaction revealed the following exchange:

> [The Petitioner]: Is that a news van?
>
> Pickard: Looks like.

[The Petitioner]: Is it on the news this morning?

Pickard: I don't know. I haven't had time to watch.

[The Petitioner]: If it is, are they going to say my name over the news?

Sergeant: Nobody knows anything at this point.

[The Petitioner]: You know, I didn't mean to kill that guy.

Sergeant: As far as I know.

When they arrived at the jail, Detective Wes Martin obtained [the Petitioner]'s consent to have his blood drawn, and Sergeant Pickard transported him to the hospital for that to be done.

Just after 11:00 a.m., Lieutenant Tarlecky and Detective Lisa House interviewed [the Petitioner] at the sheriff's office. They advised [the Petitioner] of his *Miranda* rights, and he signed the Admonition and Waiver form. Subsequently, they interviewed [the Petitioner], and the jury was shown a video recording of the interview. During the interview, [the Petitioner] described the events of October 29 and 30. He did not work on October 29, so he spent time with friends, particularly Matthew Griffin. [The Petitioner] told the officers that Matthew Griffin's father had been friends with the victim. At some point prior to October 29, Matthew Griffin told [the Petitioner] about the guns at the victim's house and showed him where the victim lived.

[The Petitioner] said in his statement that he "ate" several Xanax pills throughout the day and smoked marijuana. He went to the mall, to a high school football game, and to a friend's apartment. He and Matthew Griffin went "muddin[g]" in Matthew's truck. At some point, [the Petitioner] concocted a plan to go to the victim's house to take his guns. He said that he would have tried to sell the guns because he needed money to pay for a loan and car insurance. [The Petitioner] said that he tried to get friends to go with him to the victim's house, but the people he asked were either unavailable or were unwilling to go. After parting from Matthew Griffin, [the Petitioner] said that he went home for a short time. He left his house with his loaded shotgun in its case and drove his parents' car to

- 5 -

Walmart, where he bought gloves and a ski mask. He said that he wanted to disguise himself in case he saw anyone at the victim's house. [The Petitioner] said that the shotgun was for his own protection. [The Petitioner] drove to the victim's house and walked inside through an unlocked door. He found the gun rack almost immediately but wanted to walk through the house to see if anyone was awake. [The Petitioner] said he walked through the kitchen and "back around." When he did that, he saw the victim. [The Petitioner] said,

> I was trying to make my way to the door[,] and I seen [sic] him holding a pistol . . . . I believe I was standing right beside the door[,] and then he come [sic] around the corner with a pistol. And I think he fired two shots[,] and it [sic] went to my right—to right of me[,] and that's when I shot. And when I shot, I didn't even aim it at him.

[The Petitioner] recalled pumping the shotgun but only remembered firing once. He said that he had three shells in the gun and believed the shells were birdshot. [The Petitioner] said that when he saw the victim fall, he left the house. He did not know "which way [he came] out," and he could not immediately find his vehicle. [The Petitioner] recalled hearing people in the front yard. When he found his car, he "sat there until everybody pulled up."

[The Petitioner] gave his permission for the police to search his cellular telephone, and he also gave permission to search his bedroom at his parents' house. He told Detective House where he kept his remaining ammunition. Lieutenant Tarlecky said that he found a text message conversation on [the Petitioner]'s telephone wherein [the Petitioner] asked Matthew Griffin, "Last drive on right?" The lieutenant said that the message was sent at 3:59 a.m. but not delivered until later that day. Detective House testified that she found the ammunition exactly where [the Petitioner] had told her it would be.

Dr. Feng Li, Senior Associate Medical Examiner, testified that the victim died from two shotgun wounds to the left side of his body, both of which were "potentially fatal." One wound perforated the victim's left subclavian artery, and the second caused rib fractures and a contusion of the left lung. Dr. Li opined that the muzzle of the shotgun was five to seven feet from the victim.

- 6 -

Several Tennessee Bureau of Investigation ("TBI") agents testified regarding the forensic analysis associated with this case, all of whom were accepted by the trial court as experts in their respective fields. Special Agent John Harrison testified that [the Petitioner]'s blood was negative for alcohol. Special Agent Dawn Swiney testified that [the Petitioner]'s blood was positive for the family of drugs called benzodiazepines and for marijuana metabolite. She further testified that she performed a basic drug screen on [the Petitioner]'s blood, which included screening for Alprazolam, also known as Xanax, and that the screening was negative for Alprazolam. She explained that it would take eighteen to sixty hours for the amount of Alprazolam in the body to become too low to register in the screening.

Special Agent Jennings Russell Davis, II, testified that he analyzed the [gunshot] residue kits taken in this case. The results for the victim's hands were inconclusive, and the results for the [the Petitioner]'s hands were negative for [gunshot] residue. Agent Davis also tested the clothing collected from [the Petitioner]. He found [gunshot] residue on the right sleeve of [the Petitioner]'s hooded jacket and on the ski mask. No [gunshot] residue was found on the remaining articles of clothing.

Special Agent Alex Brodhag testified that he examined both firearms associated with this case. He stated that the nine millimeter pistol found at the scene fired the bullet casings also found at the scene. Agent Brodhag further stated that the shotgun found in [the Petitioner]'s possession fired the two spent shells found at the scene. The shells found at the scene were manufactured by Kent and were twelve gauge, number eight birdshot. Agent Brodhag testified that the ammunition found at [the Petitioner]'s home was consistent with that found at the scene. He further testified that the shotgun pellets removed from the victim's body were number eight birdshot.

Matthew Griffin and Holly Haskins testified on behalf of [the Petitioner]. Matthew Griffin testified that the victim was "like a second father to [him]" and that [the Petitioner] was his best friend. He had a "misunderstanding" with the victim that led him to call the drug task force to make a report against the victim two days before the victim's death. Matthew Griffin testified that he spent the day with [the Petitioner] on October 29. He said that [the Petitioner] might have had some liquor, and he recalled that [the Petitioner] bought Xanax. He did not personally see [the Petitioner] take the Xanax, but he said that [the Petitioner] slept

through much of their "four-wheeling" trip.  Matthew Griffin attributed [the Petitioner]'s sleepiness to the effects of Xanax.  He said that he never took [the Petitioner] to Elephant Walk.  On cross-examination, Matthew Griffin said that he had not been mad enough at the victim to kill him.

Holly Haskins testified that she overheard a conversation between [the Petitioner] and Matthew Griffin about the two of them going somewhere.  She recalled that [the Petitioner] seemed reluctant to go.  She did not remember the destination they discussed, and she did not remember telling law enforcement that they mentioned the name "Lassiter."

Following the close of proof and deliberations, [the Petitioner] was convicted as charged.  The trial court sentenced him to life in prison for the felony murder conviction and to six years each for the other two convictions.  The trial court ordered that all sentences be served consecutively.

*State v. Tyler James Reed*, No. M2012-02542-CCA-R3-CD, 2013 WL 6123155, at *1, 5-10 (Tenn. Crim. App. Nov. 20, 2013) (internal footnotes omitted), *perm. app. denied* (Tenn. Apr. 14, 2014).  This court affirmed the Petitioner's convictions, and the Tennessee Supreme Court denied further review.  *Id.* at *26.

### *Post-conviction proceedings*

The Petitioner timely filed his post-conviction petition on April 14, 2015.  At the evidentiary hearing, the post-conviction court admitted a collective exhibit that contained orders from the Board of Professional Responsibility that disbarred lead trial counsel and appellate counsel.  Kelly Reed testified that she was the Petitioner's mother and that she hired lead trial counsel to represent the Petitioner.  Mrs. Reed paid lead trial counsel $50,000 for the representation, but lead trial counsel also requested more money "for additional fees or funds for different things."  Mrs. Reed stated that lead trial counsel pressured her to convince the Petitioner to give a truthful version of the events.  David Reed, the Petitioner's father, testified similarly to Mrs. Reed.

Blake Blumenthall testified that he had been friends with the Petitioner since middle school.  Mr. Blumenthall received a letter from the Petitioner, in which the Petitioner asked Mr. Blumenthall to lie for him.  On cross-examination, Mr. Blumenthall stated that he was not asked to testify at the Petitioner's trial.

Calvin Hullett testified that he formerly worked for lead trial counsel and appellate counsel as an investigator.  Mr. Hullett stated that lead trial counsel frequently shared

theories of the firm's cases with Mr. Hullet. Mr. Hullett agreed that these theories were "fanciful[.]" On cross-examination, Mr. Hullett stated that, in his role as investigator, he interviewed the Petitioner and Matthew Griffin.

Appellate counsel testified that she worked with lead trial counsel when Mr. and Mrs. Reed retained lead trial counsel to represent the Petitioner. Appellate counsel represented the Petitioner during the preliminary hearing and indictment but then withdrew from the Petitioner's case when the Petitioner used appellate counsel's address to send contraband to the county jail.[2] After the Petitioner's conviction, Mr. and Mrs. Reed retained appellate counsel's firm to represent the Petitioner on appeal. The Petitioner waived appellate counsel's conflict of interest, and she represented him during his motion for new trial and appeal. Appellate counsel sent the Petitioner and his family a copy of the appellate brief that she prepared; neither the Petitioner nor his family asked for additional issues to be raised on appeal. Appellate counsel stated that she raised the following issues in the Petitioner's appellate brief because the issues were meritorious: (1) denial of the motion to recuse; (2) denial of the motion for change of venue; (3) motion to dismiss count one of the indictment, felony murder; (4) evidentiary issues; (5) denial of the motion to suppress; and (6) prosecutorial misconduct. Appellate counsel's goal for the Petitioner's appeal was for this court to overturn the Petitioner's convictions and order a new trial. After this court affirmed the Petitioner's convictions, appellate counsel filed a Rule 11 application for permission to appeal to the Tennessee Supreme Court. Appellate counsel testified that she did not file a petition for this court to rehear the Petitioner's appeal because she "didn't see any basis for it." Appellate counsel stated that lead trial counsel "would certainly brainstorm possible defenses, based on discovery and conversations with clients."

The Petitioner testified that he was eighteen years old at the time of the offenses. The Petitioner agreed that, prior to the current offenses, he had pled guilty to theft. When the Petitioner first met with lead trial counsel, the Petitioner gave lead trial counsel a version of the offenses that was similar to the first statement he gave to law enforcement. However, lead trial counsel "never seemed like he was satisfied with what [the Petitioner] had told him." Lead trial counsel offered various theories to the Petitioner as to why the Petitioner was at the victim's residence. The Petitioner stated that lead trial counsel "continually question[ed] [the Petitioner] in a suggestive manner" "[l]ike[] he was trying to imply that he wanted [the Petitioner] to tell him something more." Lead trial counsel suggested to the Petitioner that the victim exchanged drugs for sexual favors from young men. Lead trial counsel also implied that the Petitioner was covering for Matthew Griffin. The Petitioner testified that, when he could not come up with a theory that

---

[2] The Petitioner was later charged and convicted of introduction of contraband into a penal facility for his involvement in this offense.

satisfied lead trial counsel, Mr. and Mrs. Reed informed him that lead trial counsel was threatening to withdraw from the Petitioner's case because the Petitioner was not cooperating. The Petitioner testified that he felt "obligated" to do what lead trial counsel wanted him to do because his parents had paid a substantial fee for lead trial counsel's representation.

Lead trial counsel asked the Petitioner if any of the Petitioner's friends could corroborate his version of the offenses. The Petitioner wrote a letter to two of his friends asking the friends to speak with lead trial counsel and testify on his behalf. The Petitioner stated that the letter "[wa]s an attempt to have [the friends] go along with a story that [the Petitioner] had . . . made up, with the direction of [lead trial counsel]." The friends declined to testify on the Petitioner's behalf at trial.

The Petitioner's family informed him that the State had offered a sentence of life if he pled guilty to the offenses. However, lead trial counsel wanted to present the Petitioner's version of the offenses to the State in exchange for a possible plea agreement with a sentence of twenty or twenty-five years. The Petitioner believed that lead trial counsel would speak to the State and that he would not have to proceed to trial. After the Petitioner implicated Matthew Griffin in another version of the offenses, lead trial counsel set up a meeting with the State. The Petitioner met with lead trial counsel the morning before the meeting, and he learned that he would be speaking to the State in person. The Petitioner testified that he did not realize that speaking to the State could have negative consequences at trial because he believed that his case would not proceed to trial. After the Petitioner gave his statement to the State, his trial was postponed, but the Petitioner did not receive another plea offer. The Petitioner was aware that the State could use his statement against him if he testified at trial if his testimony at trial differed from his statement. Lead trial counsel advised the Petitioner to not testify because the Petitioner had given several statements with different versions of the offenses.

The Petitioner stated that lead trial counsel "mentioned" investigating the Petitioner's mental health, but lead trial counsel did not arrange for a mental health evaluation for the Petitioner. Additionally, lead trial counsel did not arrange for independent testing of the Petitioner's blood samples or the clothing that he was wearing during the offenses. Regarding the text message between the Petitioner and Matthew Griffin, the Petitioner stated that lead trial counsel discussed the correlation between the text message and the timing of the offenses with him. The Petitioner stated that he was unaware of his trial strategy during trial. The Petitioner did not understand why lead trial counsel requested jury instructions on self-defense and voluntary intoxication because "throughout the entire trial [lead trial counsel] kind of maintained this theme that [the Petitioner] never even went into the house."

On cross-examination, the Petitioner testified that he was on probation for a theft conviction when the offenses occurred. The Petitioner agreed that, prior to his *Momon* hearing at trial, he discussed testifying with lead trial counsel. The following exchange then occurred:

[THE STATE:] If you testified at trial, [the Petitioner], what would have been your testimony?

[THE PETITIONER:] It would have been -- I don't know.

[THE STATE:] This is your chance to tell the Court. If you were going to testify and tell the truth, tell the Court what you would have testified to. You're claiming that this proffer statement, it prevented you from testifying at trial. What would have been your testimony?

[THE PETITIONER:] The . . . truth about what had happened that night.

THE [POST-CONVICTION] COURT: So tell us what the truth is.

. . . .

THE [POST-CONVICTION] COURT: Start at the very beginning, because, you know, a trial is a search for the truth. So, you're under oath, and tell us the truth.

[THE PETITIONER:] I can't tell you what I would have said, at -- at that point.

THE [POST-CONVICTION] COURT: No, tell us what the truth is. I want to know what the truth is.

. . . .

[THE PETITIONER:] I don't know what I would have said, at that point, when the trial was happening.

But I can tell you, now, what the truth was and what the truth is. And it -- that's that I went to Mr. Lassiter's home by myself, with the intent to commit a burglary.

- 11 -

I walked into his house. The door was unlocked. At some point while I was there, -- well, I was there a very brief amount of time.

A dog woke up and barked. At that point, I was scared that maybe somebody would wake up. I tried to make my way to the door to get out of the home.

Before I could get to the door, Mr. Lassiter -- at that point in time, I didn't know who it was, because my back was turned.

Somebody began shooting at me. I turned around and returned fire. I didn't -- at the time, I thought that I had only shot -- fired once. I didn't know until later on, after reading the discovery, that there was [sic] actually two spent shells found.

I didn't stop to see who it was or if I hit them. I just knew that there wasn't [sic] any more shots being fired at myself.

I left the residence. I wasn't familiar with the property. I was intoxicated. I didn't know where I was going. I got lost in the field. It was dark. I couldn't find the car.

I -- when I did finally find the -- see where the car was, I was -- wasn't in a good state of mind. I was having hallucinations that there w[ere] people waiting around the car, who -- that weren't really there.

I -- I kind of crawled, sort of like a--an army crawl, if you will, because I thought there was people standing around the vehicle. As I got closer, I realized there wasn't anybody there.

I was on the ground. I seen [sic] headlights coming. Now, I -- I know that that was a police officer. He continued by the car on up to the residence.

After he passed, I got into the car to try to leave and more officers pulled up, at that point, and that's when they found me in the car.

The Petitioner agreed that the version of events that he testified to at the post-conviction hearing was the same version of events that he gave to Detectives House and Tarlecky.

- 12 -

The Petitioner stated, in response to the post-conviction court's question, that he never had any mental health issues. The Petitioner was unsure whether an independent analysis of the clothing that he wore during the offenses would have found any new evidence. He believed that the report of the analysis of his blood sample was incorrect and that an independent analysis of his blood sample would have shown the presence of narcotics in his system. The Petitioner was unable to explain to the post-conviction court what further investigation into his text message exchange with Matthew Griffin would have accomplished. The Petitioner asserted that, if he received a new trial, he would testify that he was walking towards the door of the victim's house and was not pointing his weapon at the victim when the victim shot at him.

Lead trial counsel testified that he represented the Petitioner on the current charges. He stated that four attorneys, paralegals, and investigators from his law office worked on the Petitioner's case. Lead trial counsel met with the Petitioner several times while the Petitioner was incarcerated pre-trial in the county jail. He also discussed discovery with the Petitioner, which included the statements that the Petitioner gave to law enforcement and the text message exchange between the Petitioner and Matthew Griffin. Lead trial counsel's investigator spoke with several witnesses in the Petitioner's case. Lead trial counsel explained that, because the Petitioner made several statements to law enforcement after the offenses, lead trial counsel's trial strategy was "to try to reach out to the [State] and see if we couldn't try to get some sort of a deal[.]" Lead trial counsel testified that the State never made a plea offer to the Petitioner. Regarding the proffer statement that the Petitioner made to the State shortly before trial, lead trial counsel stated the following:

> Well, what I recollect is the story that [the Petitioner] gave us when we went out there and kind of took a history from him and the stories that were in his statements, I thought there was more to the story than that, and I thought there may have been at least one or maybe two other people involved.

> And so, I discussed the fact with him that I didn't think that he was being altogether forthcoming with us, and that unless the statements were completely suppressed, that our best strategy and hope would be to go to the [State] and see if they didn't have some interest -- you know, we weren't going to make it any worse, you know, sitting down with the [State] and having a proffer. It wasn't going to make it any worse.

> It -- so I thought maybe it could improve our position some, if there was some other players involved in this that were not being looked at to the degree to which they should have been.

- 13 -

Lead trial counsel testified that he did not advise the Petitioner to create a false story to tell the State. He also testified that he did not advise the Petitioner to ask friends to lie on the stand at the Petitioner's trial. Lead trial counsel stated that he had "numerous conversations" with the Petitioner about what his statement would be at the proffer meeting with the State. Lead trial counsel agreed that the Petitioner's proffer statement was different from the Petitioner's previous statements. Lead trial counsel explained to the Petitioner that the proffer statement could not be used against him at trial if he did not testify at trial.

Because the Petitioner had made several statements to law enforcement, lead trial counsel testified that the theory of the Petitioner's defense was that the Petitioner "was telling an authority figure what they wanted to hear in these statements." Lead trial counsel successfully suppressed one of the Petitioner's statements, but he believed that the remaining statements would be admitted at trial.

On cross-examination, lead trial counsel agreed that he did not believe the Petitioner's version of the offenses. He explained that he talked to the Petitioner "about theories that [he] had that [he] felt like fit the facts better than what [the Petitioner] was telling [him]." Lead trial counsel agreed that he discussed with the Petitioner a theory that the victim was exchanging sexual favors for drugs with young men because the victim's door was unlocked and because the victim was naked at the time of the offenses. Lead trial counsel agreed that he became frustrated with the Petitioner because the Petitioner gave lead trial counsel a different version of the offenses each time that lead trial counsel spoke with the Petitioner. Lead trial counsel did not recall telling Mr. and Mrs. Reed that he would withdraw from the Petitioner's case if the Petitioner did not cooperate with him. Lead trial counsel agreed that the text message exchange between the Petitioner and Matthew Griffin led him to believe that Matthew Griffin was also involved in the offenses.

Lead trial counsel stated that he was "probably" concerned about the Petitioner's mental state during the offenses because the Petitioner was young and faced a life sentence. Lead trial counsel agreed that the Petitioner was prescribed Risperdal and was on suicide watch when he was initially incarcerated pre-trial. Lead trial counsel agreed that the Petitioner informed lead trial counsel that he had marijuana in his system at the time of the offenses, but lead trial counsel did not seek independent analysis of the Petitioner's blood sample. Lead trial counsel agreed that, while he cross-examined Matthew Griffin at trial, lead trial counsel had no proof of Matthew Griffin's involvement in the offenses, other than the text message exchange. Lead trial counsel testified that he requested a jury instruction on self-defense, but the trial court denied his request. Lead trial counsel believed that, if the Petitioner had testified, it was not more likely that the

- 14 -

trial court would have instructed the jury on self-defense. Lead trial counsel testified that a forensic expert testified at trial that he could not determine whether the Petitioner or victim fired first; lead trial counsel explained that he believed that this testimony was sufficient to warrant a self-defense instruction. Upon questioning from the post-conviction court, lead trial counsel stated that he essentially argued "legal nullification" to the jury and hoped that the jury "would not find convicting [the Petitioner] to be a just outcome[.]"

In its order denying relief, the post-conviction court found that the disciplinary actions against lead trial counsel and appellate counsel "had nothing to do with their conduct in this case." The post-conviction court noted that "[t]he evidence at the trial was very strong against the Petitioner, and this is something that [lead trial counsel] and the other attorneys recognized in forming a defense for their client." The post-conviction court found that "[d]ifferent statements of the Petitioner were given to different law enforcement officers at different times during the investigation and after his arrest after he had been in custody." The post-conviction court found that lead trial counsel's trial strategy was to argue that the Petitioner "told law enforcement what they wanted to hear when they interviewed him" and that lead trial counsel requested jury instructions on self-defense and intoxication.

Regarding the proffered statement, the post-conviction court found that "[b]ecause this proffered statement differed completely from the statements that he had given law enforcement, [the Petitioner] knew that he would be impeached by the false proffered statement." The post-conviction court also found that the Petitioner "made it perfectly clear at the evidentiary hearing that in looking back he did not know which version he would testify to had he testified during the trial." The post-conviction court noted that lead trial counsel testified that "he never told the [Petitioner] to make up a story about what happened and that he did not know about his client's letter to Blake Blumenthall." Lead trial counsel also testified that, "based on the age of the [Petitioner] and the circumstances of the case, he hoped that there would be a 'legal nullification' after consideration of all the circumstances."

Regarding appellate counsel, the post-conviction court found that the Petitioner's appellate counsel "wrote and argued the Motion for New Trial concentrating on various evidentiary rulings[,]" filed a "detailed" appellate brief, and filed a Rule 11 petition for review by the Tennessee Supreme Court.

The post-conviction court concluded that lead trial counsel "thoroughly investigated the facts and the evidence" in the Petitioner's case. The post-conviction court noted that lead trial counsel successfully suppressed one of the Petitioner's statements to law enforcement. The post-conviction court also noted that the Petitioner

went through a *Momon* hearing at trial and decided against testifying. The post-conviction court concluded that the Petitioner did not establish that lead trial counsel's and appellate counsel's performances were deficient.

The Petitioner now timely appeals the post-conviction court's denial of relief.

## II. Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial

strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### Ineffective assistance of lead trial counsel

#### False proffer

The Petitioner contends that lead trial counsel "led [the Petitioner] to construct a false narrative that [lead trial counsel] then used in an unsuccessful attempt to leverage a plea offer from the State, without regard for the consequence to [the Petitioner] at trial, without fully advising [the Petitioner] of the implications of the proffer if and when his case went to trial[.]" The Petitioner argues that he suffered prejudice because, absent this deficient performance, he "could have testified at trial in a manner not inconsistent with the statement that was entered into evidence, and would have given a basis to the jury being charged with a self-defense instruction[.]" The State asserts that lead trial counsel challenged the Petitioner's versions of the events because "he was trying to get the [P]etitioner to tell the truth." The State also argues that the Petitioner was not prejudiced by lead trial counsel's performance because the Petitioner testified at the post-conviction hearing that, if he had testified at trial, he would have testified similarly to his initial statement to Detectives House and Tarlecky, which was presented to the jury.

The Petitioner stated that lead trial counsel "continually question[ed] [the Petitioner] in a suggestive manner" "[l]ike[] he was trying to imply that he wanted [the Petitioner] to tell him something more." When lead trial counsel set up a meeting

between the Petitioner and the State, the Petitioner told the State a version of the offenses that implicated Matthew Griffin. The Petitioner testified that he was precluded from testifying at trial by giving the State a false statement because the State would use the false statement to impeach his credibility if he testified. Lead trial counsel testified that, while he offered various theories to the Petitioner, he did not advise the Petitioner to lie to the State at the proffer meeting. The Petitioner was unable to say what version of the offenses he would testify to if he received a new trial. The post-conviction court found that "[b]ecause this proffered statement differed completely from the statements that he had given law enforcement, [the Petitioner] knew that he would be impeached by the false proffered statement." The post-conviction court also found that the Petitioner "made it perfectly clear at the evidentiary hearing that in looking back he did not know which version he would testify to had he testified during the trial." The post-conviction court implicitly accredited the testimony of lead trial counsel and concluded that the Petitioner had not established that he was prejudiced by lead trial counsel's actions.

We agree with the post-conviction court that the Petitioner has not established that he was prejudiced by lead trial counsel's actions. While the Petitioner may have misunderstood lead trial counsel's intent behind his bouncing around theories of the case, the Petitioner exceeded the scope of lead trial counsel's advice by giving a false statement to the State. The Petitioner was aware that the State could use his proffered statement against him if he testified at trial and his testimony at trial differed from his proffered statement, but he gave a false statement anyway. Because the Petitioner knew at the time he gave the statement that a false statement could foreclose his ability to testify at trial without negative consequences, he cannot establish that he suffered prejudice from lead trial counsel's actions. Further, the Petitioner could not tell the post-conviction court what version of the offenses that he would testify to if he was granted a new trial. The Petitioner cannot establish that the outcome of his trial would have been different if he had not proffered a false statement to the State when he cannot decide what he would have testified to at trial. We conclude that the Petitioner is not entitled to relief on this ground.

*Mental state and voluntary intoxication*

The Petitioner additionally asserts that lead trial counsel failed to "adequately investigate [the] Petitioner's mental state and level of intoxication at the time of the offense and subsequent interviews with law enforcement, despite information f[rom] [the] Petitioner that he was under the influence of drugs other than marijuana[.]" The Petitioner argues that a blood test could have revealed that the Petitioner was voluntarily intoxicated, and lead trial counsel could have requested a voluntary intoxication jury instruction. The Petitioner also argues that the results of a blood test showing that the Petitioner was intoxicated, which "could have had a bearing on his ability to intelligently,

knowingly, and voluntarily waive *Miranda*, leading to the suppression of his statement, and thus fundamentally altering . . . trial strategy and the result of the trial." The State asserts that the post-conviction court properly denied relief on this ground because the Petitioner "presented no proof of any witnesses or facts that might have been uncovered through a more thorough investigation." We agree with the State.

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

Here, the Petitioner did not present evidence of what specifically an additional blood test would have revealed. The State tested the Petitioner's blood and found no evidence of alcohol or Xanax, but the blood was "positive for the family of drugs called benzodiazepines and for marijuana metabolite[.]" Assuming that some of the Petitioner's blood sample remained after the State's testing, the Petitioner could have conducted independent testing of the sample to establish that the testing results would have affected his trial. Thus, the Petitioner cannot establish that he was prejudiced by lead trial counsel's failure to investigate the Petitioner's mental state or level of intoxication during the offenses. He is not entitled to relief on this ground.

*Investigation of text messages*

The Petitioner argues that:

> Given that the text messages and phone records were instrumental in establishing a timeline for [the] Petitioner in the day leading up to his arrest, failure to conduct an adequate and independent investigation into the sequence and timestamps of the text messages impaired the development of a cohesive defense theory, and demonstrates a lack of preparation in this case that was detrimental to [the Petitioner].

The State contends that the Petitioner has failed to establish that he was prejudiced by lead trial counsel's failure to investigate the text messages.

- 19 -

The Petitioner stated that lead trial counsel discussed the correlation between the text message and the timing of the offenses with him. The Petitioner was unable to explain to the post-conviction court what further investigation into his text message exchange with Matthew Griffin would have accomplished. Lead trial counsel testified that he discussed the discovery with the Petitioner, including the text message exchange. While the post-conviction court did not specifically discuss the text message exchange in its order, the post-conviction court concluded that the Petitioner was not prejudiced by lead trial counsel's representation.

We agree with the post-conviction court that the Petitioner has not established that he was prejudiced by lead trial counsel's failure to further investigate the text message exchange between the Petitioner and Matthew Griffin. The Petitioner was unable to explain how lead trial counsel could have investigated the exchange or what effect the investigation would have had on his trial. Thus, the Petitioner did not establish that, absent lead trial counsel's actions, the result of his trial would have been different. The Petitioner is not entitled to relief on this ground.

### *Ineffective assistance of appellate counsel*

The Petitioner additionally asserts that appellate counsel failed "to file a Petition to Rehear in the Court of Criminal Appeals, despite the court affirming the trial court without addressing a number of issues raised on appeal." The Petitioner asserts that this court failed to address the following issues on direct appeal:

(1.) the trial court's denial of [the Petitioner]'s Motion to Recuse[;]

(2.) the trial court's denial of [the Petitioner]'s Motion to Change Venue[;]

(3.) the trial court's denial of [the Petitioner]'s Motion to Dismiss Count One of the Indictment for Procedural and Constitutional Deficiency[;]

(4.) the trial court's error in several evidentiary rulings or procedures during trial, including, but not limited to sustaining an objection made by the State during deposition testimony of James Isenburg, overruling a hearsay objection made by [the Petitioner] during the testimony of Sgt. Pickard, and the court's assistance to the State in developing key witness testimony by asking questions of State witnesses to lay the proper predicate or foundation testimony over objection by [the Petitioner][;] [and]

- 20 -

(5.) the trial court's denial of [the Petitioner]'s motion for new trial based on prosecutorial misconduct and other issues raised on appeal that denied [the Petitioner] a fair trial.

The State contends that this court examined all of the issues raised on direct appeal and that asserting new issues in a petition to rehear would have been improper. The State also argues that the Petitioner has failed to establish that he was prejudiced by appellate counsel's actions because "the [P]etitioner has presented nothing to support his claim that the omitted issues had merit."

A defendant has a right to effective representation both at trial and on direct appeal. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel, under the *Strickland* standard set forth above. *Id.* That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Id.* at 597; *see also Carpenter*, 126 S.W.3d at 886-88.

Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.
>
> The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (internal quotation marks and citations omitted).

When a petitioner alleges that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Id.* "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887-88.

Appellate counsel's professional judgment is entitled to considerable deference with regard to which issues best served the petitioner on appeal. *Id.* at 887.

Appellate counsel stated that she raised the following issues in the Petitioner's appellate brief because the issues were meritorious: (1) denial of the motion to recuse; (2) denial of the motion for change of venue; (3) motion to dismiss count one of the indictment, felony murder; (4) evidentiary issues; (5) denial of the motion to suppress; and (6) prosecutorial misconduct. Appellate counsel stated that, if this court did not address any of those issues specifically, she did not believe it was appropriate to file a petition to rehear the Petitioner's appeal. The post-conviction court found that the Petitioner's appellate counsel "wrote and argued the Motion for New Trial concentrating on various evidentiary rulings[,]" filed a "detailed" appellate brief, and filed a Rule 11 petition for review by the Tennessee Supreme Court. The post-conviction court concluded that the Petitioner had not established that he was prejudiced by appellate counsel's representation.

Tennessee Rule of Appellate Procedure 39 states that this court may grant a petition to rehear based on the following non-controlling factors: "(1) the court's opinion incorrectly states the material facts established by the evidence and set forth in the record; (2) the court's opinion is in conflict with a statute, prior decision, or other principle of law; (3) the court's opinion overlooks or misapprehends a material fact or proposition of law; and (4) the court's opinion relies upon matters of fact or law upon which the parties have not been heard and that are open to reasonable dispute." Tenn. R. App. P. 39(a). "A rehearing will not be granted to permit reargument of matters fully argued." *Id.* The four issues raised in the Petitioner's appellate brief were fully argued and addressed by this court. Additionally, a petition to rehear is not an appropriate vehicle to introduce new issues on appeal. *See State v. William K. Pearson*, No. 87-157-III, 1988 WL 105728, at *2 (Tenn. Crim. App. Oct. 11, 1988) ("the office of the petition to rehear cannot be used to file supplemental briefs and present issues that should or could have been presented in the orderly issues of the proceedings"), *on petition to rehear* (Tenn. Crim. App. Dec. 28, 1988), *perm. app. denied* (Tenn. Apr. 3, 1989). The Petitioner is not entitled to relief on this ground.

We take judicial notice of the record of the Petitioner's direct appeal, *see* Tenn. R. App. P. 13(c) and *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987), and note that, in the Petitioner's appellate brief, he argued that (1) the trial court erred in denying his motion to suppress; (2) the evidence was insufficient to support his conviction of aggravated burglary and felony murder; (3) the trial court erred in denying the Petitioner's requests for jury instructions on self-defense and voluntary intoxication; and (4) the State committed prosecutorial misconduct. We note that, in this court's opinion in the Petitioner's direct appeal, this court addressed the following issues:

- 22 -

(1) the trial court erred by denying [the Petitioner's] motion to suppress all of the statements he made on October 30, 2009, and the physical evidence obtained as a result of those statements; (2) the evidence was insufficient to support the murder and aggravated burglary convictions; (3) the trial court erred by failing to instruct the jury regarding self-defense and voluntary intoxication; and (4) [the Petitioner] is entitled to a new trial due to prosecutorial misconduct.

*Tyler James Reed*, 2013 WL 6123155, at *1. Thus, this court addressed the issues that the Petitioner raised in his appellate brief. Because this court addressed the issues that the Petitioner raised on direct appeal, appellate counsel's failure to file a petition to rehear did not prejudice the Petitioner.

### III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the post-conviction court's denial of relief.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 23 -